# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FT. LAUDERDALE DIVISION

### CASE NO. 0:21-CV-60746-RS

JOHN AGUILA, an individual,

          Plaintiff,

v.

RIPA & ASSOCIATES, LLC, a Florida
limited liability company, JOHN DOE ONE,
an unknown individual, JOHN DOE TWO,
an unknown individual, and JOHN DOE
THREE, an unknown individual,

          Defendants.

_____/

### AMENDED COMPLAINT FOR DAMAGES AND INCIDENTAL RELIEF

Plaintiff, John Aguila, an individual, sues Defendant, RIPA & Associates, LLC, a Florida limited liability company, John Doe One, an unknown individual, John Doe Two, an unknown individual, and John Doe Three, an unknown individual, and alleges:

### GENERAL ALLEGATIONS

1.     The instant action involves claims under the Federal Odometer Act, 49 U.S.C. §32701 ("Odometer Act"), which prohibits the disconnection, resetting or alteration of odometers with the intent to change the number of miles indicated thereon. The law also requires that a written disclosure of the mileage registered on the odometer be provided by the seller to the purchaser on the title to the vehicle when the ownership of the vehicle is transferred. If the odometer mileage is incorrect, the law requires a statement to that effect to be furnished on the title to the buyer.

1

2.     Odometer tampering is a significant criminal and consumer fraud issue in the United States. According to the National Highway Traffic Safety Administration ("NHTSA"), over 450,000 vehicles sold each year have false odometer readings, causing over One Billion Dollars ($1,000,000,000.00) of loss to American car buyers.

3.     In Florida, conmen are routinely rolling back the odometers of vehicles in order to purloin profit. *See, e.g.,"Car Buyer Cries Fraud After Discovering Odometer Has Been Rolled Back,"* Miami Herald, April 8, 2013 [article concerning aggrieved car purchaser who purchased a vehicle with 56,447 miles from dealership when the actual mileage for the vehicle was 187,677].

4.     During the last several years, consumers have increasingly relied on companies such as Carfax and AutoCheck to detect odometer discrepancies in used vehicles.  However, federal and state regulatory authorities and industry experts have identified fleet vehicles such as that purchased by Plaintiff as being particularly vulnerable to odometer fraud by unscrupulous businesses.

5.     As fleet vehicles are often not serviced by third parties, information concerning mileage readings are typically not forwarded to data compilers such as Carfax and AutoCheck by the repair and service centers.   Accordingly, in the absence of service records, fleet vehicles are especially sought after by persons who are willing to criminally rollback odometers to obtain significantly higher prices for an otherwise heavily used vehicle. *See, e.g., "Preliminary Report*: *The Incident Rate of Odometer Fraud*," United States Department of Transportation, Technical Report, April 2002.

6.    The loss to Americans who buy vehicles with tampered odometers is staggering. NHTSA experts have opined that the loss as to just diminution of vale is 40-50% of the purchase price (not including increased repair and insurance costs). *See, Declaration of Robert L. Eppes*, U.S. Department of Justice, Civil Resource Manual, Addendum 175.

## ALLEGATIONS AS TO PARTIES

7.    At all times material hereto, Plaintiff, John Aguila ("Mr. Aguila"), was *sui juris* and a resident of Broward County, Florida.

8.    At all times material hereto, Defendant, RIPA & Associates, LLC ("RIPA & Associates") was a Florida limited liability company doing business in Florida.

9.    At all times material hereto, Robert Turner ("Mr. Turner") was *sui juris* and a resident of Hillsborough County, Florida.

10.    At all times material hereto, Mr. Turner was a management employee of RIPA & Associates and had the actual, apparent and/or implied authority to act on behalf of RIPA & Associates.

11.    At all times material hereto, Defendants, John Doe One, John Doe Two, and John Doe Three (collectively, "Unknown Defendants"), were individuals whose identities are currently unknown to Mr. Aguila. Through discovery, Mr. Aguila shall learn the identity of the Unknown Defendants and shall seek leave of Court to join such persons as parties.

12.    As detailed below, RIPA & Associates entered into an employment, agency, partnership or joint venture relationship with the Unknown Defendants to dispose of used fleet

vehicles with tampered odometers owned by RIPA & Associates to purloin money from unsuspecting purchasers such as Mr. Aguila.

13.     The details of the employment, agency, partnership or joint venture relationship between Unknown Defendants and RIPA and Associates are presently unknown to Mr. Aguila. But as detailed below, RIPA and Associates conspired with or aided and abetted the Unknown Defendants to sell and transfer a vehicle with a tampered odometer directly from the name of RIPA and Associates to Mr. Aguila through false disclosures under federal and state law.

14.     All acts and omissions of any employee, agent, representative, partner or joint venturer of RIPA & Associates, including Unknown Defendants, described below were within the scope of the employment and agency of the employee, agents, partner, or joint venturer or were subsequently ratified by RIPA & Associates.

15.     Venue is appropriate in this jurisdiction as the acts and transactions complained of occurred in this county.

## FACTUAL ALLEGATIONS

### Business Plan of Defendants to Dispose of Retired Fleet Vehicles

16.      Like many large fleet operators, RIPA and Associates would routinely retire vehicles that reached high-mileage status or that became costly to service.

17.     To dispose of its retiring fleet, RIPA and Associates contracted with Unknown Defendants to market and sell heavily used and high-mileage fleet vehicles.

4

18.    The vehicles sold by Unknown Defendants on behalf of RIPA and Associates were titled in the name of RIPA and Associates with a direct assignment from RIPA and Associates to whoever the Unknown Defendants sold a vehicle to on behalf of RIPA and Associates.

19.    To obtain higher prices for vehicles, the odometers were rolled back to significantly lower miles by the Unknown Defendants.

20.    To aid and abet the odometer tampering, RIPA and Associates handed the physical titles to fleet vehicles to the Unknown Defendants without completing either the assignment or mileage disclosures.

21.    As described below, Defendant John Doe One sold a vehicle to Mr. Aguila that was owned and titled in the name of RIPA and Associates. The sale to Mr. Aguila was on behalf of and for the benefit of RIPA and Associates.

22.    As described below, Defendant John Doe One concealed his identity by using the fake name of "Bob Marks" to avoid getting caught.

23.    With respect to Defendant John Doe Two, the unknown individual was an employee of RIPA and Associates who was the custodian of the physical titles for vehicles and who coordinated the sale of the vehicle by RIPA and Associates to Mr. Aguila using Defendant John Doe One's marketing and salesmanship.

24.    With respect to Defendant John Doe Three, the unknown individual was a person who worked in concert with the other Defendants to roll-back the odometers of fleet vehicles, including the vehicle sold to Mr. Aguila, so that all Defendants could illegally profit from the sale of vehicles owned by RIPA and Associates at inflated prices.

***Purchase of Work Vehicle by Plaintiff***

25.    In August 2020, Mr. Aguila needed a reliable, lower mileage used pickup for his small business.

26.    After viewing several vehicles on the internet, Mr. Aguila found a 2015 Dodge Ram 1500 ("Pickup"), offered for sale by a "Bob Marks" as the undisclosed agent of RIPA and Associates on the Offer-up Website:



("Pickup Advertisement").

27.     The Advertisement made the following representations as to the Pickup:

- that the Pickup was a 2015 ("Year Representation");

- that the Pickup had a mileage of 82,000 miles ("First Mileage Representation"); and

- the Pickup had a "clear title" ("Title Representation").

28.     The Advertisement was cleverly designed to create the artifice that "Bob Marks" was a small business through the use of a stock image related to a plumbing company:



29.     Seeing the plumbing badge in the Advertisement, Mr. Aguila reasonably assumed that "Bob Marks" was a small businessman looking to sell his own work vehicle and that Mr. Aguila would be able to save money by buying from a private owner as opposed to a dealership.

30.     Mr. Aguila contacted "Bob Marks" by his phone: 954-461-1981.

31.     "Bob Marks" confirmed that the Pickup was available.

32.     "Bob Marks" told Mr. Aguila the following about the Pickup to entice Mr. Aguila to buy the Pickup:

- that the Pickup was a work vehicle that he used in his plumbing business ("Prior Use Representation");

- that he was "*getting rid of his old trucks*" that were used in his business ("Liquidation Representation"); and

- that the mileage was 82,000 ("Second Mileage Representation").

33.     With respect to the Liquidation Representation, Mr. Aguila had seen that there had been at least one other pickup truck advertised by "Bob Marks" that was nearly identical to the Pickup that Mr. Aguila was considering.

34.     Considering the two ads both being run with the same plumbing badges, Mr. Aguila reasonably believed the story that "Bob Marks" was just a plumber selling his used work trucks as he had stated in the Liquidation Representation.

35.     Mr. Aguila told "Bob Marks" that he would like to see the Pickup and that if it looked as good as shown on the Pickup Advertisement that he would buy the Pickup.

36.     "Bob Marks" told Mr. Aguila to meet him "*behind his plumbing business*" in Pompano Beach.

37.     "Bob Marks" told Mr. Aguila to meet him a lot behind his plumbing company at 1840 NE 41st Street, Pompano Beach, Florida 33064 ("Faux Business Location").

38.     Unbeknownst to Mr. Aguila, the Faux Business Location was the location of a "*plumbing business*" but not that of "Bob Marks."[1]

---

[1] The actual plumbing business, A Better Plumbing Corporation, confirmed that it does not know a "Bob Marks" (or whatever alias he may use), did not sell the Pickup and was none too pleased to have their business involved in the grift.

39.     The Faux Business Location was a clever ruse to create a staging area where "Bob Marks" could do go about laundering car titles to unsuspecting purchasers without being tracked to a home address or legitimate business.

40.     When Mr. Aguila arrived at the Faux Business Location, he met with "Bob Marks" behind a plumbing business.

41.     "Bob Marks" was in a large dark color Ford pickup (either a F250 or F350) with a young girl.[2] By information and belief, the pickup was also part of a fleet owned by RIPA & Associates that had been provided to "Bob Marks" as his personal vehicle by RIPA & Associates.

42.     While Mr. Aguila started to inspect the Pickup, another man drove up to look at the Pickup.

43.     The other interested purchaser told "Bob Marks" that he would need financing.

44.     "Bob Marks" suddenly agreed to lower the price to $11,500.00 based on "*the condition*" of the vehicle.

45.     In consideration of what has since been learned by Mr. Aguila, the real reason for the price change was that Mr. Aguila had stated that he had intended to pay in cash. After all, a negotiated check would make it easier to find a wrongdoer.

46.      In reliance on the representations by Defendants, Mr. Aguila agreed to pay $11,500.00 ("Purchase Price").

47.     "Bob Marks" then took out an original title for the Pickup Truck ("Transfer Title").

---

[2] The presence of the child with "Bob Marks" also caused Mr. Aguila to lower his guard and to further trust "Bob Marks." After all, decent men and women do not bring young children to watch them commit crimes.

48.    "Bob Marks" appeared to be filling out the assignment section using a blue pen.

49.    "Bob Marks" handed the Transfer Title to Mr. Aguila with an instruction to fill out his name and address.

50.    Mr. Aguila complied and handwrote his name and address with his own black pen.

51.    Mr. Aguila signed his name to the Transfer Title.

52.    After Mr. Aguila handed back the Transfer Title, "Bob Marks" asked Mr. Aguila to "*go and check the mileage reading*."

53.    In almost the same instant, "Bob Marks" literally took the black pen out of Mr. Aguila's hand. As the transaction occurred at the height of the COVID-19 pandemic, the grabbing of the black pen struck Mr. Aguila as profoundly odd as "Bob Marks" had been using his own blue pen.

54.    Not knowing why he was being asked to look at the mileage, Mr. Aguila read out the mileage reading on the odometer to "Bob Marks."

55.    The odometer reading of approximately 82,500 miles on the odometer was a further representation of the mileage by Defendant ("Third Mileage Representation").

56.    "Bob Marks" completed the Transfer Title by inserting the mileage information.

57.    Mr. Aguila paid the Purchase Price in cash.

58.    "Bob Marks" folded the Transfer Title and handed it to Mr. Aguila.

59.    For reasons that were not then known to Mr. Aguila, "Bob Marks" instructed Mr. Aguila to transfer the title at a specific private tag agency located at 1503 S. Cypress Road, Pompano Beach, Florida 33060 ("Tag Agency").

60.    As will be discussed below, "Bob Marks" carefully choregraphed the completion of the Transfer Title – right down to the use of different color pens – to allow him to dupe Mr. Aguila into buying a vehicle with a rolled odometer from RIPA and Associates.

61.    The choregraphed fraud would also allow Defendants to assert so-called "plausible deniability."[3]

62.    Mr. Aguila left with the Pickup pleased that he had bought a lower mileage work vehicle at a reasonable price.

63.    Mr. Aguila was wrong.

64.    Unbeknownst to the Mr. Aguila, shortly before placing the Pickup for sale, Defendants or person working with, at the direction or with knowledge of Defendants rolled back the odometer of the Pickup by as much as 100,000 miles.

### *Discovery of Mileage Rollback*

65.    When Mr. Aguila returned home, he recognized that he just paid most of his savings to a man who did not give him a bill of sale. As a result, he had an uneasy feeling that something was not right about the transaction and the man he had just met.

66.    Mr. Aguila accessed the CARFAX website and obtained a report on the Pickup ("CARFAX Report").

---

[3] "Plausible deniability" refers to circumstances where a denial of responsibility or knowledge of wrongdoing cannot be proved as true or untrue due to a lack of evidence proving the allegation. This term is often used in reference to situations where management deny responsibility for or knowledge of wrongdoing by employees.

67.     The CARFAX Report disclosed that the Pickup was a 2014 vehicle as opposed to a 2015 as stated by the Pickup Advertisement.

68.     A copy of a CARFAX Report with a run date of January 17, 2021 is attached hereto as Exhibit "A."

69.     The CARFAX Report also showed through service records that the Pickup had far, far greater mileage than what he had been told and what was showing on the odometer.

70.     The last service record on the CARFAX Report reflected that the Pickup had 177,372 miles on the odometer on April 8, 2020- some four months before the purchase by Mr. Aguila.

71.      Mr. Aguila looked more closely at the title that had been handed to him by "Bob Marks."

72.     To his utter and complete shock, he saw that "Bob Marks" had filled out the Transfer Title to reflect that the mileage was inaccurate by inserting an "x" at the "NOT THE ACTUAL MILEAGE" designation after Mr. Aguila had handed the Transfer Title back to "Bob Marks" with his name and address:

73. A copy of the Transfer Title is attached hereto and incorporated herein by reference as Exhibit "B."

74. According to the Transfer Title, the Pickup was owned by RIPA & Associates.

75. Mr. Aguila also read that the address of RIPA & Associates was in Tampa and not the Faux Business Location in Pompano Beach.

76. Mr. Aguila saw that someone named "*Chris LaFace*" had signed the Transfer Title and not the man who held himself out as "Bob Marks."

77. Compounding his injury, Mr. Aguila also confirmed that had been duped as to the year of the Pickup. Contrary to the Year Representation, the model year of the Pickup was 2014 as opposed to 2015:



78. Mr. Aguila also noticed that for the first time that for some inexplicable reason "Bob Marks" wrote down that he had received *$5,000.00* as opposed to *$11,500.00*:

79.     Mr. Aguila then remembered that "Bob Marks" had insisted that Mr. Aguila use only the Tag Agency to place the title in his name.

80.     The intended use of the Tag Agency was purposeful on the part of Defendants as it would avoid having vehicle purchasers having direct contact with employees of the Florida Department of Highway Safety and Motor Vehicles ("Fla. DMV") who may question the mileage disclosures in the fullness of time.

81.     It was now apparent to Mr. Aguila that "Bob Marks" was engaged in an elaborate and well-planned scheme to defraud.

82.     Seeing that he had been badly cheated, Mr. Aguila began to investigate on his own and then through counsel the provenance of the Pickup.

83.     "Bob Marks" was careful not to leave a paper trial that would lead either a cheated buyer or the Fla. DMV to himself. He purposefully did not provide a written sales agreement. This was so despite "Bob Marks" apparently disposing of dozens of fleet vehicles.

84.     But "Bob Marks" left his fingerprints, nonetheless.

### *Discovery of Multiple Dummy Ads*

85.     The Offer-up Website showed that "Bob Marks" was selling many other similar vehicles to the Pickup Truck – each having attributes of a commercial fleet vehicle, to wit: a neutral color heavy-duty pickup truck. Most of the vehicles also appeared to have mileage close to that of the Pickup Truck.

86.     More disturbing was the fact that "Bob Marks" was also apparently using at least one another name – "Bobby Turner."

14

87.    The following advertisement from the Offer-up Website is an example of those run by Defendant's agent using the moniker "Bobby Turner":



88.     As with the Pickup Advertisement, Defendant falsely used a badge that would lead a purchaser to believe that "Bobby Turner" was a small businessman – just this time a roofer.

### *Acknowledgment of Misconduct by Defendants' Agent*

89.     With the above information confirming that he had been cheated, Mr. Aguila sent a text message to the cell phone of the man who sold the Pickup to him.

90.     When Mr. Aguila confronted him with the uncovered fraud, "Bob Marks" made up a thin cover story about a prior engine replacement and how he had made a mistake in not telling Mr. Aguila of the odometer alteration.

91.     Incensed about the odometer fraud by the Defendant, Mr. Aguila demanded a refund.

92.     When confronted with the facts of the misconduct, "Bob Marks" agreed to provide a refund to Mr. Aguila.

93.     In the days and weeks that followed, "Bob Marks" postponed meeting with Mr. Aguila with one excuse after another.

94.     Ultimately, "Bob Marks" stopped returning calls in the apparent belief that Mr. Aquila would give up and go away.

95.     "Bob Marks" was wrong.

### *Discovery of Fleet Management by Mr. Turner*

96.     Mr. Aguila did an internet search on the name of the person who signed the Transfer Title: Chris LaFace ("Mr. LaFace").

97.     Mr. Aguila learned that Mr. LaFace was the president and chief executive officer of RIPA & Associates- the prior owner.

98.     Mr. Aguila saw the photo of Mr. LaFace on *Linkedin.com* and he was not the man who he had meet and who filled the mileage disclosure in the Transfer Title.

99.     Out of pure speculation, Mr. Aguila called the corporate headquarters of RIPA & Associates to ask whether anyone named "Robert Turner" was an employee.

100.    To his surprise, the receptionist told Mr. Aguila that a person named "Robert Turner" was the fleet manager.

### *Pervasiveness of Fraud by Defendants*

101.    According to the Fla. DMV records, RIPA & Associates has owned over three hundred fleet vehicles in the last four years.

102.    By information and belief, RIPA & Associates through the Unknown Defendants has previously sold other fleet vehicles with tampered odometers to other unsuspecting vehicle buyers or failed to complete the title and odometer disclosure forms in accordance with state and federal law.

103.    As a salient example of the latter misconduct, RIPA & Associates and Mr. LaFace allowed their agent to complete the odometer disclosure statement mandated by 49 U.S.C. §32705 in manner which perpetuated the fraud on Mr. Aguila.

104.    Large fleet operators have seen the utility of using tracking platforms to reduce operations cost and to maintain passive surveillance on employees using fleet equipment.

17

105.    RIPA and Associates uses the FleetWatcher management program for all its vehicles. According to its website:

> *"If it moves, I've got telematics on it." Robert Turner, Fleet Operations Manager at RIPA & Associates discusses the success their team has seen these past 9 years using FleetWatcher on their heavy equipment, which saved them $1.3 million in preventative maintenance, resale value and fuel usage their first year of implementation.*
>
> *https://ripaconstruction.com/the-true-value-of-telematics/* (last accessed 03-15-21).

106.    According to FleetWatcher, the fleet management system used by RIPA & Associates, each vehicle has a GPS device that allows for a daily report that shows mileage of each vehicle. As a result, each of the vehicles disposed of by Defendants would have a report showing true mileage.

107.    Based on the Offer-Up website, RIPA & Associates may have sold at least 54 vehicles through its agent using the false name "Bob Marks" and 63 vehicles through its agent using the false name "Bobby Turner" since June 2020.

108.    According to statements made to a construction industry magazine by RIPA & Associates, the fleet of pickup trucks by RIPA and Associates is significant:

> ***For Robert Turner, fleet operations manager at RIPA & Associates, the phrase "ignorance is bliss" does not apply****. In underground utility contracting, ignorance is anything but bliss.* ***With over 900 employees, 450 pieces of heavy machinery and 180 pickup trucks****, RIPA is one of the largest underground contractors on the west coast of Florida, taking jobs up and down the coast of the Gulf of Mexico. On any given day, Turner's jobsites are spread across 125 miles from north to south and 50 miles from east to west, covering six counties.*
>
> *The True Value of Telematics*, Construction Business Owner, June/July 2020.
> (emphasis added)

18

109.    Mr. Aguila does not know the extent and details of the involvement of Mr. Turner in the misconduct above or whether he was the "Bob Marks" or "Bobby Turner" that met with him. However, as Mr. Turner was the person in charge of the fleet at RIPA & Associates, his job duties would necessarily include the disposition of retired vehicles. To be sure, Mr. Turner set in motion the fraud that took Mr. Aguila's money.

110.    As an experienced fleet manager, Mr. Turner most certainly knew that federal and state law proscribed such acts as having a title signed by his boss, Mr. LaFace, in blank without a completed odometer disclosure, or worse, the outright forgery of Mr. LaFace's signature on the assignment. As seen above, Mr. Turner is a self-professed vigilant guardian of the vehicles and equipment of his employer as he does not believe "*ignorance is bliss*."

111.    Through discovery, Mr. Aguila will learn the names of all persons who participated in the fraud above and shall amend his Complaint to add such persons as parties.

## COUNT I - ACTION FOR VIOLATION OF THE FEDERAL ODOMETER ACT
### (Tampering and False Disclosure)

112.    This is an action for violation of the Federal Odometer Act, formerly known as the "Federal Motor Vehicle Information and Cost Savings Act," 49 U.S.C. §32710, *et seq.,* ("Odometer Act" or "Act"), and the regulations promulgated thereunder.

113.    Mr. Aguila realleges and reaffirms the allegations contained in Paragraphs 1 through 111 above as if set forth hereat in full.

114.    Pursuant to 49 U.S.C. §32703, a person may not *inter alia*:

- disconnect, reset, alter or have disconnected, reset, or altered, an odometer of a motor vehicle intending to change the mileage registered by the odometer;

19

- with intent to defraud, operate a motor vehicle on a street, road or highway if the person knows that the odometer of the vehicle is disconnected or not operating; or

- conspire to violate 49 U.S.C. §32703, §32704 or §32705 of the Act.

115.    Pursuant to 49 U.S.C. §32704, a person may service, repair or replace the odometer of a motor vehicle if the mileage registered by the odometer remains the same as before the service, repair or replacement.   If the mileage registered cannot remain the same – (1) a person shall adjust the odometer to read zero; and (2) the owner of the vehicle or agent of the owner shall attach written notice to the left door frame of the vehicle specifying the mileage before the service, repair or replacement and the date of service of service, repair or replacement.

116.    The odometer of the Pickup was either tampered with or was replaced by Defendants without compliance with the Act.

117.    Defendants knew or had reason to know that the odometer had been tampered with.

118.    The Act requires that a person transferring a motor vehicle's title must give the transferee a written disclosure of the mileage registered by the odometer or a disclosure that the mileage is unknown if the transferor knows the mileage registered by the odometer is incorrect. 49 U.S.C. §32705.

119.    A false statement on the disclosure form violates the Act's disclosure requirements. In addition, the Act states that a person who transfers ownership of a vehicle may not "give a false statement to the transferee in making the disclosure required by [NHTSA's odometer disclosure] regulation." 49 U.S.C. § 32705(a)(2).

20

120.    The Act proscribes false statements not just on the disclosure form, but false statements made in connection with making the disclosure. Thus, oral statements, advertising, and written claims found in documents other than the disclosure form are covered, as long as these statements are related to the making of the disclosures. Because the disclosures must be made as part of the process of transferring title, representations related to a sale are related to the process of making the disclosures.

121.    As described above, Defendants failed to provide a complete and accurate disclosure of the mileage of the Pickup and made false statements as to mileage to Mr. Aguila in the marketing and sale of the Pickup.

122.    As described above, Defendants entered into a conspiracy to violate the requirements of the Act in contravention of 49 U.S.C. §32703(3).

123.    As a direct and proximate result of the above-described actions, Defendants violated the Act with the intent to defraud.

124.    As a direct and proximate result of the conspiracy of Defendants, the actual and economic damages of Mr. Aguila include but are not limited to:

    (a)    the diminution in value of the Pickup as a result of it having an inaccurate odometer, an impaired title and being a year older than represented;

    (b)    the increased cost of repairs, service, and insurance; and

    (c)    loss of income from being unable to use the Pickup for business purposes.

21

125.    As a result of the violation of the Act, Defendants are liable to Mr. Aguila in an amount equal to three times actual damages or $10,000.00, whichever is greater, plus attorney's fees and costs pursuant to 49 U.S.C. §32710.

126.    Mr. Aguila has retained the undersigned attorneys to represent his interest herein and is obligated to pay said attorneys a reasonable fee for their services.

WHEREFORE, Plaintiff, John Aguila, an individual, demands judgment against Defendants, RIPA & Associates, LLC, a Florida limited liability company, John Doe One, an unknown individual, John Doe Two, an unknown individual, and John Doe Three, an unknown individual, for statutory and actual damages, together with attorney's fees and costs pursuant to 49 U.S.C. §32710.

## <u>COUNT II - ACTION FOR VIOLATION OF THE FEDERAL ODOMETER ACT</u>
### (Aiding and Abetting)

127.    This is an action for violation of the Federal Odometer Act, formerly known as the "Federal Motor Vehicle Information and Cost Savings Act," 49 U.S.C. §32710, *et seq.,* ("Odometer Act" or "Act"), and the regulations promulgated thereunder.

128.    Mr. Aguila realleges and reaffirms the allegations contained in Paragraphs 1 through 111 above as if set forth hereat in full.

129.     Pursuant to 49 U.S.C. §32703, a person may not *inter alia* conspire to violate 49 U.S.C. §32703, §32704 or §32705 of the Act.

130.    Pursuant to 49 U.S.C. §32704, a person may service, repair or replace the odometer of a motor vehicle if the mileage registered by the odometer remains the same as before the service, repair or replacement.   If the mileage registered cannot remain the same - (1)  a   person   shall

adjust the odometer to read zero; and (2) the owner of the vehicle or agent of the owner shall attach written notice to the left door frame of the vehicle specifying the mileage before the service, repair or replacement and the date of service of service, repair or replacement.

131.   The odometer of the Pickup was either tampered with or was replaced by Defendants without compliance with the Act.

132.   Defendants knew or had reason to know that the odometer had been tampered with or replaced without compliance with the Act.

133.   The Act requires that a person transferring a motor vehicle's title must give the transferee a written disclosure of the mileage registered by the odometer or a disclosure that the mileage is unknown if the transferor knows the mileage registered by the odometer is incorrect. 49 U.S.C. §32705.

134.   A false statement on the disclosure form violates the Act's disclosure requirements. In addition, the Act states that a person who transfers ownership of a vehicle may not "give a false statement to the transferee in making the disclosure required by [NHTSA's odometer disclosure] regulation." 49 U.S.C. § 32705(a)(2).

135.   The Act proscribes false statements not just on the disclosure form, but false statements made in connection with making the disclosure. Thus, oral statements, advertising, and written claims found in documents other than the disclosure form are covered, as long as these statements are related to the making of the disclosures. Because the disclosures must be made as part of the process of transferring title, representations related to a sale are related to the process of making the disclosures.

136.    As described above, Defendants failed to provide a complete and accurate disclosure of the mileage of the Pickup and made false statements as to mileage to Mr. Aguila in the marketing and sale of the Pickup.

137.    Defendant entered into a conspiracy to violate the requirements of the Act in contravention of 49 U.S.C. §32703(3).

138.    As a direct and proximate result of the above-described actions, Defendants violated the Act with the intent to defraud.

139.    As a direct and proximate result of the fraud and non-disclosures by Defendants, the actual and economic damages of Mr. Aguila include but are not limited to:

> (a)    the diminution in value of the Pickup as a result of it having an inaccurate odometer, an impaired title and being a year older than represented;

> (b)    the increased cost of repairs, service, and insurance; and

> (c)    loss of income from being unable to use the Pickup for business purposes.

140.    As a result of the violation of the Act, Defendants are liable to Mr. Aguila in an amount equal to three times actual damages or $10,000.00, whichever is greater, plus attorney's fees and costs pursuant to 49 U.S.C. §32710.

141.    Mr. Aguila has retained the undersigned attorneys to represent his interest herein and is obligated to pay said attorneys a reasonable fee for their services.

WHEREFORE, Plaintiff, John Aguila, an individual, demands judgment against Defendants, RIPA & Associates, LLC, a Florida limited liability company, John Doe One, an unknown individual, John Doe Two, an unknown individual, and John Doe Three, an unknown

individual, for statutory and actual damages, together with attorney's fees and costs pursuant to 49 U.S.C. §32710.

## COUNT III - ACTION FOR FRAUD

142.    This is an action for fraud brought herein pursuant to the doctrine of pendant jurisdiction.

143.    Mr. Aguila realleges and reaffirms the allegations contained in Paragraph 1 through 111 above as if set forth hereat in full.

144.    As more fully described above, RIPA & Associates misrepresented material facts concerning the mileage of the Pickup.

145.    RIPA & Associates knew that the representations set forth above were false or made such representations recklessly, and RIPA & Associates had no reasonable grounds for believing those representations to be true.

146.    RIPA & Associates knew that the above representations and omissions concerning the purchase of the Pickup were material and important.

147.    RIPA & Associates intended to deceive Mr. Aguila, who relied upon the misrepresentations and omissions to his detriment.

148.    As a direct and proximate result of the fraud and non-disclosures by RIPA & Associates, the actual and economic damages of Mr. Aguila include but are not limited to:

      (a)    the diminution in value of the Pickup as a result of its having an inaccurate odometer, an impaired title and being a year older than represented;

      (b)    the increased cost of repairs, service and insurance; and

(c)      loss of income from being unable to use the Pickup for business purposes.

WHEREFORE, Plaintiff, John Aguila, an individual, demands judgment for damages against Defendant, RIPA & Associates, LLC, a Florida limited liability company, together with interest and costs.

## COUNT IV - ACTION FOR NEGLIGENT MISREPRESENTATION

149.    This is an action for negligent misrepresentation brought herein pursuant to the doctrine of pendant jurisdiction.

150.    Mr. Aguila realleges and reaffirms the allegations contained in Paragraph 1 through 111 above as if set forth hereat in full.

151.    As more particularly described above, RIPA & Associates misrepresented and failed to disclose material facts concerning the sale of the Pickup.

152.    RIPA & Associates believed the above statements to be true and to be complete, but which were in fact false and incomplete.

153.    RIPA & Associates was negligent in making the statements and omissions concerning the sale of the Pickup. Defendant should have known that the statements were false.

154.    RIPA & Associates, in making the statements concerning the sale of the Pickup, intended that Mr. Aguila rely upon said statements.

155.    As a direct and proximate result of the negligent misrepresentation of RIPA & Associates, the actual and economic damages of Mr. Aguila include but are not limited to:

(a)      the diminution in value of the Pickup as a result of its having an inaccurate odometer, an impaired title and being a year older than represented;

(b)      the increased cost of repairs, service and insurance; and

(c)      loss of income from being unable to use the Pickup for business purposes.

WHEREFORE, Plaintiff, John Aguila, an individual, demands judgment for damages against Defendant, RIPA & Associates, LLC, a Florida limited liability company, together with interest and costs.

## COUNT V- ACTION FOR FRAUDULENT INDUCEMENT

156.     This is an action for fraudulent inducement brought herein pursuant to the doctrine of pendant jurisdiction.

157.     Mr. Aguila realleges and reaffirms the allegations contained in Paragraph 1 through 111 above as if set forth hereat in full.

158.     As more particularly described above, RIPA & Associates induced Mr. Aguila into buying the Pickup by knowingly making misrepresentations of material fact and omitting material facts with the intent that Mr. Aguila rely on them to his detriment.

159.     RIPA & Associates' misrepresentations of material fact and omissions of material fact were made and omitted with the intent that Mr. Aguila rely on them or be deceived by them to his detriment.

160.     Mr. Aguila justifiably relied upon the misrepresentations to his detriment and further, had Mr. Aguila been advised of the truth, Mr. Aguila would not have purchased the Pickup.

161.     As a result of the fraud and deceit by RIPA & Associates, the actual and economic damages of Mr. Aguila include but are not limited to:

      (a)    the diminution in value of the Pickup as a result of it having an inaccurate odometer, an impaired title and being a year older than represented;

      (b)    the increased cost of repairs, service, and insurance; and

      (c)    loss of income from being unable to use the Pickup for business purposes.

WHEREFORE, Plaintiff, John Aguila, an individual, demands judgment for damages against Defendant, RIPA & Associates, LLC, a Florida limited liability company, together with interest and costs.

### COUNT VI- ACTION FOR BREACH OF EXPRESS WARRANTY

162.    This is an action for breach of express warranty brought herein pursuant to the doctrine of pendant jurisdiction.

163.    Mr. Aguila realleges and reaffirms the allegations contained in Paragraph 1 through 111 above as if set forth hereat in full.

164.    From the various statements concerning the Pickup Truck, RIPA & Associates made express warranties ("Express Warranties") pursuant to Florida Statute §672.313, Uniform Commercial Code ("UCC") by both affirmation of fact or promise and by description of goods as follows:

      A.  As to Mileage:  through the Mileage Representations, RIPA & Associates made a warranty that the mileage was true and accurate;

      B.  As to Model Year- through the Year Representation, RIPA & Associates made a warranty that the Pickup was a 2015; and

    C.  <u>As to Clear Title</u>- through the Title Representation, RIPA & Associates made a warranty that the title to the Pickup would not be impaired by any brand such as one imposed by the Fla. DMV that mileage was inaccurate.

165.    As detailed above, RIPA & Associates has breached the Express Warranties.

166.    As a direct and proximate result of the breach of the Express Warranties, Mr. Aguila has been damaged. The damages of Mr. Aguila include but are not necessarily limited to:

    (a)    the diminution in value of the Pickup as a result of it having an inaccurate odometer, an impaired title and being a year older than represented;

    (b)    the increased cost of repairs, service and insurance; and

    (b)    loss of income from being unable to use the Pickup for business purposes.

167.    Mr. Aguila has performed all conditions precedent to the filing of the instant action.

WHEREFORE, Plaintiff, John Aguila, an individual, demands judgment for damages against Defendant, RIPA & Associates, LLC, a Florida limited liability company, together with interest and costs.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, John Aguila, an individual, pursuant to Rule 38(b), Federal Rules of Civil Procedure, demands a trial by jury of all issues so triable.

*/s/ Robert W. Murphy*
ROBERT W. MURPHY
Florida Bar No. 717223
1212 S.E. 2nd Avenue
Fort Lauderdale, Florida 33316
Telephone: (954) 763-8660
Fax: (954) 763-8607
Email: rwmurphy@lawfirmmurphy.com


JOSHUA FEYGIN, PLLC
JOSHUA FEYGIN, ESQ.
FLORIDA BAR NO.: 124685
1800 E. Hallandale Bch. Blvd. #85293
Hallandale, Florida 33009
Tel: (954) 228-5671 /Fax: (954) 697-0357
Email:   Josh@JFeyginesq.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 28, 2021, I electronically filed the foregoing document with the Clerk of Court for the U.S. District Court, Southern District of Florida, using the CM/ECF system.   I further certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Federal Rules of Civil Procedure, Rule 5(b)(2), as follows:

Robert C. Graham, Jr., Esq.
rgraham@mpdlegal.com
E.A. "Seth" Mills, Jr., Esq.
smills@mpdlegal.com
Ty G. Thompson, Esq.
tthompson@mpdlegal.com
MILLS PASKERT DIVERS
100 North Tampa Street, Suite 3700
Tampa, FL 33602
*Attorneys for Defendant*

*/s/ Robert W. Murphy*
Attorney